Hardin, P. J.
September 8, 1873, the defendant’s boat, the “ St. John,” about six o’clock in the evening, lay at its pier in the city of New York, ready to receive passengers as a common carrier upon the North river, from New York to Albany. Just before six o’clock, the starting time of the boat, the plaintiff in company with some friends, some of whom were to accompany him on the trip to Al-. bany, and some who came to the wharf to see him off, reached the pier and the plaintiff passed over the gang plank to the steamer and stood a few feet from the gangway. While there standing in company with other passengers, numbering nearly a hundred, preparations were made and orders given for the boat to start. It has been decided and must be held that plaintiff was “there in the relation and character of a passenger, and it must also be held as it has already been decided in this case that the defendant owed “to him the duty of a carrier of passengers although ” his fare had not then been paid. 68 N. Y., 306.
“The defendant owed to him the duty of a carrier of passengers to a person in its charge as such. That duty is to use the strictest diligence to protect the life and person. By this rule the defendant is liable for any injury which might reasonably be anticipated to occur in view of all the circumstances and of the nature of the carriage and the number and character of the persons upon the boat.” Id., 309.
When the decision reported in the 5th of Hun, was *600 made and the review thereof had in the court of appeals, reported in the (68 N. Y., supra), the fact had been affirmatively found that the gate closing the gangway entrance to the boat had been placed in position.
See findings of the referee, quoted (5 Hun, 525), viz.: “ The gate was put properly in its place before the plaintiff fell overboard, and the mate was about to put the top rail on, and had turned to take it in his hands for that purpose when the plaintiff was pushed overboard with the other passengers.” See, also (68 N. Y., 310), Folger, J., says: “The gate across the gangway was put in its place in due time. It did not break under the pressure, so it did not. thus occasion or aid the accident. * * * It is established that after the gate was properly in place and before the accident the forward end of it was lifted from the staple and it was left hanging by the aft end so that the accident did not occur from the gate not having been put in place, or from its not being fit and sufficient for the purpose, but from the unauthorized displacing of it by some volunteer or wrong-doer not an employee of the defendant, and from the rush upon plaintiff of the other passengers in unthinking and needless eagerness to see the man overboard. There is no proof that if the gate had been left in place it would not have resisted and sufficiently checked that rush.” Near the close of the opinion from which we have just quoted it is said, viz.: “ That the defendant is not charger-able with negligence for not putting in place the rail and stanchions before the starting of the boat.”
During the trial which was brought in review at the last, hearing in the court of appeals (89 N. Y., 621), the defendant gave evidence tending to show that the gate had been placed in position, “from one to three minutes before the accident,” and it was said by Tracy, J., in his opinion upon that occasion, viz.: “ The evidence given by the plaintiff is, not in conflict with the testimony of these witnesses.”' (Referring to the evidence tending to show the gate had been put in position). He, also, says: “ There is no evidence that the person who lifted the gate from its place was an employee of the boat. All the evidence tends to show that he was not, and the fact that no servant of the defendant went into the river would seem to be conclusive upon this point.”
As we understand the opinion from which we have just quoted it assumes that the gate Was in place and that it was removed by an unauthorized person, and that there was not evidence sufficient to warrant a submission of the question to the jury of “whether the gate had been put in its place at the time of the accident.” The judge finally adds.: “ Under the evidence this was not a question in dispute,. *601 and it was error to submit it to the jury for them to determine.”
We are called upon by the evidence found in the appeal book now before us to determine whether or no there was sufficient evidence given upon the trial now before us for review to warrant submitting to the jury the question of fact as to whether the gate had been placed in position at the time the accident occurred. It is strongly contended by the plaintiff that there was sufficient evidence of the fact, that the gate was not in position at the time the accident occurred. Oil the contrary it is contended by the defendant that “no contradiction of the positive'evidence that the gate was hung in its place from one to three minutes before the accident, and was partly lifted out by an unknown man, who passed out of the forward end while the mate’s back was turned, appears in the plaintiff’s evidence, or in any of the testimony.”
It is also contended by the defendant’s counsel that, “Even assuming the contrary, there was not enough in the evidence to submit to the jury, nothing to reasonably justify a conclusion of negligence contrary to the rule laid down distinctly in the cases cited above.”
He also calls our attention to the rule laid down for interpreting positive and negative evidence, and cites Culhane v. The New York Central (60 N. Y., 137), and Milton v. H. R. S. Co. (37 N. Y., 210).
Upon these contradictory positions taken by the parties, it becomes necessary to look into the evidence given upon the trial before us for review. In the plaintiff’s testimony we find, he says:
“The boat was going; the mate had the gate; Mr. Mull was the mate; at the time this man came through; Mr. Mull was standing partly in front of the gangway opening at the part this gate sets on; he had the gate; I supposed he was in the act of putting it in- he had the gate in his hand, partly in front of the gangway opening; as tins man came through he partly turned; he had hold of the gate some way with both hands this man passed right by through there along the boat, outside of this guard, and stepped right along on that and jumped; I was pushed overboard right then-, there was no gate in; I didn't see the gate after that; it was knocked" out of the way—at least, it was not there when I got to it.’
The witness, Jacob Schwab, testified: “ The gangplank was hauled up about the lime or right after the order‘all aboard;’ I supposed the hawsers were hauled in; the gangplank was hauled out on to the pier, and the boat started; the first thing I saw after that was six or eight of them going overboard into the water right through the gangway opening, I don’t think the-gate had been closed up to that time; no, that is my recollection of it; there was a man had hold of the gate; he had it in his hand, and in the act of putting it in; the man was in the act of putting the gate in, about as the crowd came and pushed along, and Cleveland and the other gentlemen—I don’t know who they were—went overboard into the water, the boat started on; the boat was then in motion; I should judge it had gone thirty-five or forty feet, about twelve to fifteen feet from the pier; I was looking right at the transaction which occurred then. * * * I saw the lady on the pier running and lialloa *602 ing, and I turned around to look at her, as I turned back to look at the boat; I saw the party coming over into the water- I could not tell you where the gate was at that time; there was no gate there then; the boat kept right on its course, it did not halt ” At folio 157, be says “ When the boat, started, as I recollect now, the man had the gate in his hand in the act of putting it in; that was all that I remember of now which had been done prior to the accident; the man witli the gate in his hand stood in front of the gangway opening, as near as I can remember, coming this way with it—towards it; 1 think he was coming towards the front of it, towards the front of the inclosure with the gate, from inside of the boat; he was very close to the opening, not over two feet; I think may be not that; I could not say positively; prior to the time the passengers went through, there was nothing done towards the closing of the gangway than what I have stated.”
In the course of his cross-examination, at folio 160, he says “ My recolleclection is, that I then saw the man with the gate,.as six or eight went overboard, whatever they were; I merely glanced back at the woman, and immediately glanced back at the boat again, the boat had started before I turned to look at the lady; when I glanced back I think the man had the gate in his hand; yes, sir, just abo.ut that time 1 saw the people in the water.”
At folio 164, lie says. “ I did not see the gate put up "
At folio 170 the witness adds. “My present recollection as to this gate being hung across the gangway before the accident is, that I don’t think it was put in, that is my present recollection.”
The witness, Sliaughnessy testified that he entered the boat in connection with the plaintiff, and says- “The gate was there, 1 know it was there, but •whether it was up or not, I always said I never knew;” and at folio 176 lie adds: “I don’t know as I saw the gate at all, except in the water, ” and at folio 189 he says: “ I don’t think the man who first went through the gate lifted it up; my recollection is that he didn't.”
Plaintiff also called as a witness Patrick Garigan, who accompanied the plaintiff to the pier to see him off, and he says, viz.; “After I got to the pier I was standing about four to five feet from the gangway on the dock; I saw Mr. Cleveland and Sliaughnessy go on the boat; I stood looking at the boat; I don’t ever remember seeing the gate; I would have to say that there was no gate there ”
It was shown by the testimony that the gate was picked out of the water, and that it was not broken, and as bearing upon the plaintiff’s theory of the case, testimony was given tending to show that it was not possible to lift one end of the gate so as to carry it over the top rail. There was only a play of a half an inch after the gate was in position, and that to raise the gate when in place it would have to be raised the width of the top rail and the distance from the clamps, and one witness testified that in order to remove the gate, “ a man would have to catch hold of the center of it and raise it out; lift it right out bodily.”
The plaintiff and several of the witnesses, from whose testimony the quotations have been made, were sworn on previous trials in this action, and the testimony given by them upon such.former trials was referred to in the course of the cross-examinations had at the trial now before us, and many portions of the evidence given in the former trials were read with a view of contradicting the witnesses and confronting them with such former testimony with a view of shaking or impairing the testimony given upon this trial, so far as the same were in conflict. Several contradictions appear, There is quite a wide difference in the *603 recollection of the witnesses, and some of the contradictions are such that it seems difficult to reconcile the statements made by the witnesses during the former trials with those made on this trial, upon the supposition that the witnesses were honest and truthful on the last occasion.
However, this is not the time and place to determine which statement should be credited, or whether the witnesses, in making the different statements, have intentionally falsified. Such questions belong to the province of the jury. In considering the question of whether the plaintiff was properly non-suited or not, he is entitled to the most favorable construction that may be given in his behalf to the testimony offered upon the issue.
To show that the gate had been placed in position, and contradict the testimony given by the plaintiff, which we have already referred to, the defendant called several witnesses whose testimony is quite positive and pointed to the effect that the gate had been placed in position, or at least in the gangway at the time the accident occurred. Several of the witnesses who speak upon this subject were employees of the defendant; and what force and credit should be given to their testimony, when found in conflict with other witnesses, was an appropriate question for the consideration of the jury. After a careful review of the evidence offered by the defendant, tending to show that the gate had been adjusted before the accident occurred, we are still of the opinion that the evidence which was offered by the plaintiff, and which we have quoted and referred to, together with the facts and circumstances attending the accident, presented a question of fact for the jury to determine.
We are, therefore of the opinion that it was a question of fact for the jury to determine whether the gangway gate had actually been placed within its sockets before the person referred to escaped from the boat, and before the rush of the passengers to the side in response to the exclamation, “Man overboard,” the difficulty which a person would encounter in lifting the gate oiit of its place, the circumstance that it could not be removed by the pressure of the crowd if it had once been put in its proper place, the fact that it was taken out of the water unbroken, bore quite significantly upon the question of whether the position of the plaintiff taken upon the trial, that the gate had not been placed in its proper position, was true and reliable. To solve that question, the principal question of fact, we think, was the province of the jury, If the defendant’s boat started without the gangway gate being set, the defendant omitted to provide in time against one of the dangers to be guarded against by the use of such a gate. *604 We find nothing in either of the decisions heretofore made in this case indicating that the omission to place the gate in position at the time of leaving the pier was not negligence. Presumably one of the uses to be made of the gangway gate was to guard against just such an accident as the one that occurred on the occasion of the plaintiff’s injuries. The case differs quite materially from Dougan v. The Champlain Transportation Co. (56 N. Y., 1). In that case, the only “proof of negligence was the omission to inclose the space between the railing and the deck so as to preclude the possibility of slipping under it. In that case, the evidence was “that all the passenger boats upon the lake had been constructed and run in the same way in this respect.” Besides, that was agateway upon an upper deck where passengers had no occasion to congregate, while in the case in hand the passengers were congregated, doubtless some of them for the purpose of awaiting an opportunity to purchase tickets at the office, which was near by, and some of them awaiting instructions as to the locations of their staterooms, and for information which should lead to their proper distribution in the other parts of the boat.
While we recognize the rule of law which requires the plaintiff to allege and prove that his own negligence did not contribute to the injuries which he received (Reynolds v. The New York Central R. R. Co., 58 N. Y., 248; Hale v. Smith, 78 id., 480), we are of the opinion that upon the evidence given upon the trial now before us it would be error to hold as a matter of law that plaintiff was guilty of contributory negligence. The most favorable view of that question which defendant is entitled to assert is that it was a question of fact for the jury. While we are not advised of the exact evidence that was before the court of appeals on that question when the case was decided as reported in the 68th of New York, we are of the opinion that the rule of law laid down by Judge Folger in his opinion in regard to this question should be applied to the testimony now before us. He said: “We do not think that the evidence will warrant us in holding as a matter of law that the plaintiff is chargeable with contributory negligence in thinking his place inside the bulwarks, yet outside of the partition between the gangway and the main part of the boat. There is nothing to show that it was a position of such obvious or well known danger, that an ordinarily prudent and cautious man would hesitate to remain standing there at the moment of the starting of the boat to take leave of friends on the wharf.”
It does not appear that the plaintiff had violated any known instruction given to him by the defendant. The rule of law was laid down in the opinion of Merwin, J., *605 5 Hun, 525, upon this subject, when he says the plaintiff .cannot recover “if he had so far contributed to the accident by want of ordinary care, if but for that the accident would not have happened,” and in respect to the defendant’s negligence we are satisfied with the observation he made in the same opinion where he says, “No one would say they were not negligent if the gate had not been placed in at all,” and also with his further remark, viz.: “The very object of barriers of this kind is to prevent the results of such commotions. Vessels are hable to be crowded especially at gangways at the time of starting. The fact that the company provided barriers of such character show that they anticipated their necessity and use, and appreciated the importance of a strong, well secured gate. The failure to use the appliances provided seems to me a reckless disregard of the safety of the passengers.
We may add that if the jury should find that the gate had not been placed across the gangway at the time the plaintiff received his injuries, it may be properly affirmed that the defendant had not discharged its full obligation to its passengers. To discharge that obligation it was its duty, and it was “bound to use the utmost care, which is consistent with the nature and extent of the business it is engaged in, the providing of safe and suitable means of transportation, as well as in the management of the same and in making such reasonable arrangements as a prudent man would make to guard against all dangers, from whatever source arising, which may naturally, and according to the usual course of things, be expected to occur. Any violence must be provided against which might reasonably be anticipated, or naturally be expected to occur, in view of all the circumstances. * * * The precautions to be taken must be such as would be dictated by the utmost care and prudence of a very cautious person.” Deyo v. The N. Y. C. R. R. Co., 34 N. Y., 11; Maverick v. The Eighth Ave. R. R. Co., 36 id., 381; Eaton v. The Boston and Lowell R. R. Co., 11 Allen, 500.
These views lead us to the conclusion that the learned trial judge fell into an error in withdrawing the case from the jury.
Judgment and order reversed, and a new trial granted, with costs to abide the event.
Boardman and Follett, JJ., concur.